UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

EMMERSON PHIRI,

                              Plaintiff,        **COMPLAINT**

      v.

ANDERSON CENTER FOR AUTISM, PATRICK D. PAUL, in his individual and official capacity, JOHN DOE 1 through 10, and ABC CO. 1 through 10.

                              Defendants.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

-----------------------------------------------------------X

Plaintiff Emmerson Phiri, by and through his undersigned counsel, alleges upon personal knowledge and information and belief as follows:

## NATURE OF THE ACTION

1. This is an action for retaliation and discrimination. Plaintiff Emmerson Phiri was fired by his employer, the Anderson Center for Autism ("Anderson" or the "Center"), and its Executive Director and CEO Patrick D. Paul, after he blew the whistle on systemic abuse – both physical and sexual – of the vulnerable residents in Anderson's care, and because of his race and national origin/immigration status.

2. From his first days on the job, Plaintiff witnessed acts of cruelty that included starvation, assault, and grotesque sexual torture committed on individuals with autism and carried out by Anderson's staff in full view of others.

3. When Plaintiff reported the cruel and horrific conduct to his supervisors, Defendants retaliated against Plaintiff by removing him from the training program, subjecting him

1

to baseless disciplinary action, confiscating his apartment keys, threatening his immigration status, and ultimately terminating him.

4. Plaintiff's protected activities, which included cooperation with law enforcement, triggered a coordinated campaign, initiated and organized by Defendants, to silence Plaintiff, erase his presence, and suppress the truth which included manufacturing reasons to terminate Plaintiff's employment.

5. Anderson's conduct was part of an entrenched culture of cruelty, systemic abuse, deterring whistleblowers and protecting abusive and predatory staff.

6. Plaintiff brings this action under the New York Labor Law ("NYLL") § 740, the New York State Human Rights Law ("NYSHRL"), 42 U.S.C. § 1981, and 42 U.S.C. § 1983.

7. Plaintiff seeks all available relief, including economic damages, compensatory damages for emotional distress, punitive damages, and attorneys' fees and costs.

## JURISDICTION AND VENUE

8. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

9. Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

10. Plaintiff Emmerson Phiri ("Plaintiff") is an adult black male residing in the State New York. He is an immigrant from Malawi who was lawfully present in the United States.

11. Defendant Anderson Center for Autism ("Anderson" or the "Center") is a not-for-profit organization located at 4885 Route 9, Staatsburg, New York 12580, with operations in the Southern District of New York.

12. The mission statement published on Anderson's website states "Anderson Center for Autism's core philosophy is that all people deserve to live a life of quality. Anderson has the expertise, resources and technology to enable the agency to optimize the quality of life for all people with autism, around the world." (https://www.andersoncenterforautism.org/mission/).

13. The Anderson Center for Autism accommodates preschool, children's and adult's services throughout the Hudson Valley. Anderson Early Learning Academy is a state approved program that provides children ages three to five opportunities to learn in an environment that is developmentally appropriate and teaches the skills needed to be successful in kindergarten. The Center also provides educational, residential, recreational and life skills services to children with autism ages five to 21. Additionally, the Center provides various adult supportive services such as the day habilitation program, the community integration group and a residential program.

14. Anderson benefits from legislatively driven grants and explicit state-endorsed support and oversight.

15. Anderson is formally integrated within the educational framework of the State of New York.

16. Anderson is listed among "853 Schools" identified as organizations that jointly operate public school educational programs under state supervision for students requiring intensive interventions.

17. Anderson is subject high-level state oversight by the New York State Office for People with Developmental Disabilities ("OPWDD"), which is an executive agency within the State of New York whose mission is to provide services and conduct research for those with intellectual disabilities and developmental disabilities. It is one of New York's largest agencies.

18. Anderson is certified as an Article 16 Clinic by the OPWDD.

19. Anderson receives Medicaid reimbursements for educational and residential services.

20. Anderson is listed on the official website operated by OPWDD. (https://opwdd.ny.gov/location/anderson-center-autism).

21. Anderson receives substantial public funding, public recognition, and high level endorsements.

22. In August of 2023, Anderson was awarded a $125,000.00 State and Municipal (SAM) funding grant.

23. In June of 2024, Governor Kathy Hochul announced a $3,000,000.00 capital funding commitment to Anderson to help rebuild a historic carriage house and address a workforce shortage.

24. Governor Hochul stated: "As a mom, it is heartbreaking to think about a child alone, struggling and unable to get the care and support they need …[t]his funding will help the Anderson Center for Autism to continue to provide education, support and outreach services, as well as help children with autism build the skills they need to connect with the world and live healthy, independent, productive lives." (https://www.governor.ny.gov/news/governor-hochul-announces-funding-support-education-and-support-services-children-autism).

25. New York State Office of Children and Family Services Commissioner Dr. DaMia Harris-Madden said, "By investing in the rehabilitation of this facility, there is a resounding message that our children and families are supported here in New York State. We thank Governor Kathy Hochul for having the foresight to help fund valuable services for our vulnerable children, particularly those with autism. The benefits of this investment will be evidenced socially, emotionally, physically, and educationally." (*Id.*)

26. New York State Office for People with Developmental Disabilities Commissioner Kerri Neifeld said, "OPWDD applauds Governor Hochul's commitment to this exciting initiative and to ensuring that school-aged youth with developmental disabilities receive the support they need to thrive. Autism is the fastest growing diagnosis in the field of developmental disability, especially in children. By providing these youth with the supports they need at an early age, New York is ensuring that they have the building blocks to live independent lives and fully participate in their communities as adults." (*Id*.)

27. State Senator Michelle Hinchey said, "The Anderson Center is an incredible organization dedicated to building a Hudson Valley where everyone belongs. They ensure that our friends and family with disabilities have safe places to learn and exciting opportunities to carve out their own paths within our workforce and the wider community. We're thrilled about this new capital funding for the Staatsburg campus and the support it will bring to ensuring the contributions of our neighbors with disabilities are honored and valued. We thank Governor Hochul for championing this important funding." (*Id*.)

28. Assemblymember Didi Barrett said, "Anderson Center for Autism has been a pioneer in caring and innovative approaches to service delivery and education for those on the spectrum and their families. I thank Governor Hochul for her support of this important initiative to transform this historic building into a much-needed workforce development and training center here in the Hudson Valley." (*Id*.)

29. County Executive Sue Serino said, "We are grateful to Governor Hochul for this investment and her focus on behavioral health. All too often, those with the greatest needs left behind [sic]. Funding for this innovative project will not only support those served by the Anderson Center, but also help secure the needed workforce for our future." (*Id*.)

30. Defendant Patrick D. Paul ("Paul") is an adult individual residing in New York.

31. At all relevant times, Paul served as the Executive Director and CEO of Anderson and played a central and active role in leading the Anderson Center for Autism and overseeing its operations. He is sued in his individual and official capacities.

32. Prior to his role as Executive Director and CEO, Paul held several key positions within the organization, including Corporate Controller, Corporate Compliance Office, Chief Financial Officer, and Chief Operating Officer.

33. Defendant John Does 1 through 10 are fictitiously named defendants, the identities of which are unknown at present, but who are liable to Plaintiff by reason of their knowing and joint participation in the conduct that damaged Plaintiff, and who aided and abetted, ratified, authorized, acquiesced in, approved or condoned the misconduct complained of in this complaint, and specifically, includes all the individuals who participated in the illegal conduct referred to herein and/or who engaged in intentional and/or reckless extreme or outrageous conduct, which caused Plaintiff harm.

34. Defendants ABC CO. 1 through 10 are fictitious entities, the identities of which are unknown at present, but that are liable to Plaintiff by reason of their knowing and joint participation in the conduct that damaged Plaintiff, pursuant to the doctrine of *respondeat superior*, or that are otherwise responsible to Plaintiff for the wrongful conduct referred to herein.

35. At all relevant times to this action, Anderson, Paul, John Does 1 through 10, and Defendants ABC CO. 1 through 10 (collectively "Defendants") were, and continue to be, each a person engaged in an industry affecting commerce within the meaning of Title VII.

36. At all relevant times to this action, Defendants were employers of Plaintiff within the meaning of the NYLL, the NYSHRL, 42 U.S.C. § 1981, and 42 U.S.C. § 1983 because they

exercised sufficient control of Anderson's day-to-day operations to be considered employers of Plaintiff and those similarly situated.

## FACTS COMMON TO ALL CLAIMS

37. Anderson hired Plaintiff on or about October 10, 2023, as a Direct Support Trainee, where he cared for disabled individuals with autism, assisting with bathing, laundry, and meals.

38. At all relevant times, Plaintiff reported directly to Nadine Thompson ("Thompson"), a Resident Manager at the Center.

39. At all relevant times, Plaintiff worked closely with Brenda Brundi and Ama Bansou, both of whom were Direct Support Professionals.

40. At all relevant times, Plaintiff worked closely with Garnet Collins ("Collins"), a Direct Support Professional and Shift Leader.

41. As a condition of Plaintiff's employment, Plaintiff was required to work in an environment steeped in the toxic brine of discrimination where staff inflicted cruel and degrading treatment on Anderson's most vulnerable charges with Collins, emerging as a chief perpetrator.

42. Anderson's most vulnerable charges were routinely subjected to degrading, violent, and sexual abuse. Staff shouted at them, starved them, beat them with broom handles, and grabbed their genitals.

43. Plaintiff complained to Defendants that Collins yelled at Anderson's most vulnerable charges on a daily basis.

44. Plaintiff complained to Defendants that Collins forced Anderson's most vulnerable charges to go without food if they refused a meal.

45. Plaintiff complained to Defendants that Collins physically assaulted Anderson's most vulnerable charges. For example, Plaintiff reported that Collins would regularly slap

Anderson's most vulnerable charges if he believed they were not listening or complying with Collins.

46. Plaintiff complained to Defendants that Collins routinely struck Anderson's most vulnerable charges with a broom handle if he believed they were not listening or complying with Collins.

47. Plaintiff confronted Collins to demand that he stop abusing Anderson's most vulnerable charges, including the patient known as A.B. Collins told Plaintiff that the best way to deal with Anderson's charges was to "be harsh on them," force them to take cold showers, and pull them by their genitals.

48. Collins scolded Plaintiff for objecting to his methods and warned Plaintiff that "we don't need any international workers here," and did so using a tone and manner indicating a discriminatory animus for Plaintiff's national origin and immigration status. This sentiment was ultimately ratified by Anderson and its senior staff.

49. On or about May 7, 2024, after Collins became increasingly violent, Plaintiff reported Collins and the physical abuse to Thompson.

50. Thompson acknowledged Plaintiff's complaint, telling Plaintiff "I'll deal with it" but warned Plaintiff that "what happens in here, ends in here." Plaintiff understood Thompson's response as a warning to him to stop complaining about Collins' methods, which Anderson both adopted and encouraged.

51. Thereafter, Defendants through Thompson and others, began a coordinated campaign intended to discourage Plaintiff and others from speaking out.

52. Defendants, through Thompson and others, began manufacturing reasons to discipline Plaintiff, or otherwise make Plaintiff's working conditions unbearable.

53. On or about May 20, 2024, the police responded to the Center on a report that Fahim Ferdoush, a Resident Behavioral Specialist, physically abused a patient known as R.I.

54. On or about June 5, 2024, while the patient known as A.B. was experiencing a meltdown, Collins seized A.B.'s genitals with his bare hands and pulled A.B. from the room by his genitals. Plaintiff recorded the incident on his phone. Other members of Defendants' staff, including Ama Bansou, were present and observed the abuse and Plaintiff's attempt to document it.

55. On or about July 7, 2025, Collins struck the patient known as R.I. on his head with a heavy binder. Plaintiff recorded the incident on his phone. Other members of Defendants' staff were present and observed the abuse and Plaintiff's attempt to document it.

56. Later that month, Plaintiff was summoned by Thompson and Klaude Porter ("Porter"), the Staff Development Officer. They told Plaintiff that he was under investigation and accused Plaintiff of several infractions, including taking extra eggs to eat. They refused to discuss the investigation, or share any relevant details, with Plaintiff.

57. Approximately five (5) days later, Amanda Nowak, the Staff Development Officer, blocked Plaintiff from the Center's online training program.

58. On or about August 1, 2024, Plaintiff witnessed Collins hit the patient known as C.M. with enough force to knock C.M. to the ground and cause C.M.'s nose to bleed.

59. On or about August 7, 2024, Janus told Plaintiff that he was terminated from his position at the Center. Janus also seized Plaintiff's keys to the Center's facilities and Plaintiff's keys to Plaintiff's home.

60. Later that day, Ochieng Bevarlyne ("Bevarlyne"), the International Coordinator, told Plaintiff that he was not terminated and instead placed on leave.

61. On or about August 8, 2024, Plaintiff sent an email to Bevarlyne asking for clarification on whether he was terminated or suspended. Bevarlyne never responded to the email.

62. On or about August 11, 2024, Plaintiff contacted the family of the patient known as A.B. and sent them the video evidence of Collins assaulting A.B. The family contacted the police immediately.

63. On or about August 13, 2024, Tania Carswell ("Carswell") from the American Immigration Council ("AIC") contacted Plaintiff and expressed frustration that Plaintiff reported the ongoing abuse to A.B.'s family. In doing so, Carswell asked Plaintiff if he "care[d] about [his] visa" and implied that he could be deported for blowing the whistle on the disturbing abuse at the Center.

64. The following day, the New York State Police requested to meet with Plaintiff for an interview. Plaintiff agreed and an interview was scheduled for August 19, 2024.

65. A few days later, Nadine Harris ("Harris") from the AIC contacted Plaintiff and demanded that he stop cooperating with the police investigation until Defendants' staff met with him first.

66. A few days later, Harris repeated her warning to Plaintiff, not to cooperate with the police.

67. On or about August 19, 2024, Plaintiff met with the police.

68. Defendants, through Harris, terminated Plaintiff on August 20, 2024, and demanded that Plaintiff immediately depart the United States before August 31, 2024.

69. In a letter dated September 9, 2024, but furnished by Carswell on October 9, 2024, Defendants officially notified Plaintiff of his termination. The letter incorrectly stated that Plaintiff was terminated on August 14, 2024.

10

70. The stated reasons contained in the termination letter were false.

## COUNT I
### RETALIATION IN VIOLATION OF NEW YORK LABOR LAW § 740
(AGAINST ALL DEFENDANTS)

71. Plaintiff repeats and reiterates the allegations set forth above as through fully set forth herein.

72. Section 740 of the NYLL, otherwise known as New York's "whistleblower law," provides state law protection against retaliation for employees reporting misconduct and prohibits any employer from taking any retaliatory action because an employee "discloses or threatens to disclose" a practice the employee "reasonably believes is in violation of law, rule or regulation."

73. At all times relevant herein, Plaintiff was qualified to hold his position of employment with Defendants.

74. At all times relevant herein, Defendants had one (1) or more persons in its employ and thus was qualified as an "employer" within the meaning of the NYLL.

75. Throughout the relevant period, Plaintiff identified illegal acts and made protected disclosures by reporting information to Defendants that evinces violations of laws, rules, or regulations.

76. Plaintiff engaged in protected activity under the NYLL by disclosing and threatening to disclose activities that he reasonably believed violated laws, rules, and regulations.

77. Defendants retaliated against Plaintiff for his protected activity. As a result of Plaintiff's actions, Plaintiff was subjected to retaliatory treatment, and threats of retaliatory treatment, that included indefinite discipline, suspension, and termination.

78. The above retaliatory treatment by Defendants, their agents and employees were the direct result Plaintiff's opposition to Defendants' unlawful practices in violation of state and federal law, rules or regulations.

79. Because of Plaintiff's opposition to Defendants' unlawful practices, he has been subjected to abuse and mistreatment as set forth herein and has been treated differently than other employees of Defendants.

80. As a proximate result of Defendants' unlawful conduct, intentional, negligent, and reckless behavior, and violations of state and federal law, Plaintiff has suffered substantial past and future economic damages; compensatory damages; including but not limited to pain and suffering; mental and emotional distress; and other incidental damages and expenses.

81. Plaintiff suffered and continues to suffer irreparable injury and monetary damages in an amount to be determined at trial, and is entitled to an award of punitive damages, costs and attorneys' fees, and any such other relief this Court may find just and proper.

**COUNT II**
**RETALIATION IN VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW (NYSHRL)**
(AGAINST ALL DEFENDANTS)

82. Plaintiff repeats and reiterates the allegations set forth above as through fully set forth herein.

83. Section 296 of the NYSHRL provides that it shall be an unlawful discriminatory practice for any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden by the NYSHRL or because he or she had filed a complaint or testified.

84. Plaintiff engaged in protected activity by advocating for the rights of the vulnerable residents in Anderson's care, who are disabled within the meaning of the NYSHRL.

85. Defendants knew that Plaintiff engaged in protected activity.

86. At all times relevant herein, Plaintiff was qualified to hold his position of employment with Defendants.

87. At all times relevant herein, Defendants were employers within the meaning of the NYSHRL.

88. Throughout the relevant period, Plaintiff identified illegal acts and made protected disclosures by reporting information to Defendants that evinces violations of laws, rules, or regulations.

89. Plaintiff engaged in protected activity under the NYSHRL by disclosing and threatening to disclose activities that he reasonably believed violated the rights of Anderson's disabled residents.

90. Defendants retaliated against Plaintiff for his protected activity. As a result of Plaintiff's actions, Plaintiff was subjected to retaliatory treatment, and threats of retaliatory treatment, that included indefinite discipline, suspension, and termination.

91. The above retaliatory treatment by Defendants, their agents and employees were the direct result Plaintiff's opposition to Defendants' unlawful practices in violation of state and federal law, rules or regulations.

92. Because of Plaintiff's opposition to Defendants' unlawful practices, he has been subjected to abuse and mistreatment as set forth herein and has been treated differently than other employees of Defendants.

93. As a proximate result of Defendants' unlawful conduct, intentional, negligent, and reckless behavior, and violations of state and federal law, Plaintiff has suffered substantial past

and future economic damages; compensatory damages; including but not limited to pain and suffering; mental and emotional distress; and other incidental damages and expenses.

94. Plaintiff suffered and continues to suffer irreparable injury and monetary damages in an amount to be determined at trial, and is entitled to an award of punitive damages, costs and attorneys' fees, and any such other relief this Court may find just and proper.

### COUNT III
### DISCRIMINATION AND RETALIATION IN VIOLATION OF 42 U.S.C. § 1981
(AGAINST ALL DEFENDANTS)

95. Plaintiff repeats and reiterates the allegations set forth above as through fully set forth herein.

96. Defendants discriminated against Plaintiff on the basis of his race, ethnicity, and alienage in violation of 42 U.S.C. § 1981 by subjecting him to disparate treatment, harassment, and ultimately termination.

97. Plaintiff also engaged in protected activity by opposing discriminatory and abusive conduct in the workplace. In retaliation for these complaints, Defendants subjected Plaintiff to adverse employment actions, including false accusations, removal from training, and termination.

98. The adverse employment actions interfered with Plaintiff's right to make and enforce contracts, including enjoying all benefits, privileged, terms, and conditions of his employment.

99. As a direct and proximate result of Defendants' violations of § 1981, Plaintiff suffered economic and emotional harm and seeks all available remedies, including compensatory and punitive damages, attorney's fees, and costs in amounts to be determined at trial.

### COUNT IV
### VIOLATION OF 42 U.S.C. § 1983
(AGAINST ANDERSON)

100. Plaintiff repeats and reiterates the allegations set forth above as through fully set forth herein.

101. At all relevant times, the State of New York provided significant encouragement to Anderson, as described herein.

102. At all relevant times, Anderson is a willful participant in joint activity with the State of New York.

103. At all relevant times, Anderson's functions are entwined with policies adopted and promulgated by the State of New York.

104. At all relevant times, Anderson has been delegated a public function by the State of New York.

105. Plaintiff's protected activities, including the complaints he made to Defendants, related to the outrageous and disgusting abuse taking place against the individuals in Anderson's care constituted speech protected by the First Amendment of the Constitution of the United States.

106. Plaintiff's protected activities, including the complaints described herein constitute matters of public concern.

107. Defendants took adverse action against Plaintiff by manufacturing a basis for discipline, threatening deportation, seizing his home, and ultimately terminating his employment.

108. There is a causal connection between the adverse actions taken against Plaintiff and the protected speech described herein.

109. As a direct and proximate result of Defendants' violations of § 1983, Plaintiff suffered economic and emotional harm and seeks all available remedies, including compensatory and punitive damages, attorney's fees, and costs in amounts to be determined at trial.

**JURY DEMAND**

110. Plaintiff demands a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A. Award compensatory damages for lost wages, benefits, and emotional distress;

B. Award punitive damages where permitted by law;

C. Award attorneys' fees and costs;

D. Grant such other and further relief as the Court deems just and proper.

Dated: New York, NY　　　　　　　　　　**THE LAW OFFICES OF**
July 15, 2025　　　　　　　　　　　　　　**THOMAS H. ANDRYKOVITZ, P.C.**


By: /s/ Thomas H. Andrykovitz
Thomas H. Andrykovitz, Esq.
260 Madison Ave, 15th Floor
New York, NY 10016
(917) 719-0505
thomas@thomashenrylaw.com
*Attorneys for Plaintiff*